IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTOPHER MACHOREK,<br><br>          Plaintiff,<br><br>   vs.<br><br>MARRIOTT OWNERSHIP RESORTS, INC., a foreign profit corporation; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE PARTNERSHIPS 1-10; DOE UNINCORPORATED ORGANIZATIONS 1-10; and DOE GOVERNMENTAL AGENCIES 1-10,<br><br>          Defendants. | Civ. No. 15-00230 JMS-KSC<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Christopher Machorek, a former employee of Defendant Marriott Ownership Resorts, Inc. ("MORI"), brings this action against MORI seeking damages for retaliation under both federal and state law, and for intentional infliction of emotional distress.

1

Currently before the court is MORI's Motion for Summary Judgment ("MORI's Motion"), ECF No. 55. For the reasons that follow, the court GRANTS in part and DENIES in part MORI's Motion.

## II. BACKGROUND

### A. Factual Background

Plaintiff worked at Marriott owned or affiliated companies for fifteen years. Pl. Decl. ¶ 3, ECF No. 70-1. He eventually became MORI's Director of Marketing ("DOM") for the island of Kauai and held that position for the time period relevant to this litigation. *Id.* ¶ 4. As DOM, Plaintiff managed a team of Marketing Executives, collaborated with the Sales team to increase overall sales and marketing, and provided information about the company's timeshare products to interested customers. Pl.'s Dep. 58:3-24, ECF No. 56-2.

Plaintiff's immediate supervisor was Merrill Yavinsky ("Yavinsky"), who served as the Project Director for Sales and Marketing on Kauai from January 2010 to December 2015. Yavinsky Decl. ¶ 1, ECF No. 56-3. As such, he oversaw both the Marketing and Sales teams on Kauai. *Id.* Yavinsky's immediate supervisor was David Broderick ("Broderick"),[1] who served as the Regional Vice

---

[1] During the November 21, 2016 hearing, the parties informed the court that Broderick passed away after these events, and before this litigation.

President of Sales and Marketing for the Hawaii region.  Pl.'s Dep. 60:13-16,

61:16-22, 96:18-19.

     ***1.    Discussion of Restructuring, Before Plaintiff's Protected Activity***

     In late 2013, Yavinsky and Broderick began discussing the

restructuring of Plaintiff's marketing team in response to the challenges to getting

"tour flow."  Ex. A to Pl.'s CSF, ECF No. 70-3.  In an October 28, 2013 email,

Broderick asked Yavinsky to consider "restructur[ing] marketing team" and

"eliminat[ing] DOM position in favor of 1 dedicated experienced marketing

manager and or senior marketing managers."  *Id.*  On November 14, 2013,

Broderick recommended that Yavinsky hire "1 entry level marketing manager" but

made no mention of the DOM position, which Plaintiff held at the time.  Ex. B to

Pl.'s CSF, ECF No. 70-4.  Yavinsky emailed Broderick back on November 15,

2013, stating, "I am inferring from your email that if we are not meeting tour

expectations early in 2014, we will reevaluate the DOM position."  *Id.*  Broderick

responded by email later that day:

> You are correct in the assumption that if we are not able to
> really improve on productivity in significant fashion by end of
> Period 1 2014 we will have to revisit your overall Marketing
> structure which of course would include a review of the DOM

position as well as other facet [sic] of the Marketing Operation and Personnel.[2]

Ex. C to Pl.'s CSF, ECF No. 70-5.

On November 26, 2013, Broderick asked Yavinsky to "prepare a 1 or 2 page executive summary of how [he] propose[s] to move forward together with timeline, issues, personnel and any other particulars or challenges [he] may for see [sic]." Ex. D to Pl.'s CSF, ECF No. 70-6. Yavinsky sent Broderick a formal memo dated December 4, 2013, proposing a number of changes, including "eliminat[ing] the DOM position and hir[ing] a 2nd front line Marketing Manager position." Ex. D to Def.'s CSF, ECF No. 56-6. The document proposed other organizational changes "to lower overhead costs, improve tour production, improve sales efficiencies, and ultimately drive higher profitiability," but made no mention of new tour restrictions. *Id.*

### 2. *Plaintiff Reports Sexual Harassment Allegations*

On December 9, 2013, Marketing Manager Sandy Wabinga ("Wabinga") and Sales Experience Manager Teresa Doria approached Plaintiff and told him that Sales Executive Shawn Hunandi ("Hunandi") had been sexually harassing them. Pl.'s Dep. at 110:12-18. Plaintiff reported these allegations to

---

[2] During the November 21, 2016 hearing, both parties agreed that the end of "Period 1 2014" is the end of January 2014.

Regional Director of Human Resources Kelly Soldwisch ("Soldwisch") the next

day. *Id.* at 111:1-11. After an investigation into the allegations, Hunandi was fired

on December 20, 2013. Soldwisch Decl. ¶ 3, ECF No. 56-7.

In her investigation, Soldwisch spoke with Wabinga, who told

Soldwisch that "[s]he and others have been afraid to say anything because they fear

for their jobs as Merrill [Yavinsky] has a close personal relationship with Shawn

[Hunandi]." Ex. E to Pl.'s CSF, ECF No. 70-7. Yavinsky admits that Hunandi is a

"good friend." Yavinsky Dep. 53:10-13, ECF No. 70-28. In fact, Hunandi was

one of only ten people at Yavinsky's wedding, and in October 2012, Yavinsky's

family and Hunandi's family vacationed together in Napa Valley. *Id.* at 55:18-

56:21. And when Plaintiff learned of the allegations against Hunandi, Hunandi

was vacationing in San Francisco with Yavinsky and their respective sons. *Id.* at

52:20-53:9, 67:3-17.

In mid-December 2013, Yavinsky was made aware of the allegations

of sexual harassment against Hunandi. Yavinsky Decl. ¶ 8. Yavinsky was

disappointed that Plaintiff told Human Resources instead of coming to him

personally, and expressed this disappointment to Plaintiff sometime in late

December 2013. *Id.* ¶ 8; Pl.'s Dep. 125:20-126:25.

5

It is unclear if or when Broderick learned of Plaintiff's role in reporting the sexual harassment allegations against Hunandi.

### 3. *Tour Restrictions on Kauai*

On January 2, 2014, twelve days after Hunandi was terminated, Yavinsky put new tour restrictions in place at Plaintiff's location in Kauai. Pl. Decl. ¶ 34. Primarily, the new tour restrictions prevented tours to anyone who had toured any Marriott property in the previous nine months. 2d Yavinsky Decl. ¶ 2, ECF No. 71-6; Yavinsky Dep. 126:20-127:19. This restriction remained in place for five to six weeks, before Yavinsky reduced it to a three-month restriction on tours system-wide, and a six-month restriction on tours on Kauai. 2d Yavinsky Decl. ¶¶ 2-3. Yavinsky alone implemented these restrictions, and does not recall discussing them with Broderick. Yavinsky Dep. at 127:20-129:10.

As of July 22, 2016, some other changes were made to tour restrictions on Kauai:

> [W]e have opened up, if an owner is staying on points, using their points for their stay, that we do not restrict them from touring if they had stayed -- or they have toured at another site within the past three months. . . .
>
> As far as our in-house non-owner qualifications, I believe the same qualifications were -- are in place that we put in place in early 2014 except I believe that we updated the qualifications to allow friends who are staying in an owners' villa to qualify for their own gifted presentation.

6

*Id.* at 213:13-214:1.  The three-month/six-month restriction remains in place.  *Id.* at 213:4-12.

### 4.      *Elimination of Plaintiff's Position*

On May 6, 2014, Broderick emailed Yavinsky the following:

> It is now apparent that the Kauai marketing team as structured will not produce the necessary tour flow to achieve budgeted revenues at the budgeted expense level for the project.
>
> I recommend you proceed ASAP to modify your org structure in marketing department to better align with the lower level of predictive tour production.

Ex. R to Pl.'s CSF, ECF No. 70-20.  Yavinsky interpreted this to mean that "he specifically asked for the business plan to eliminate the Director of Marketing position, to be replaced with a second Marketing Manager position."  Yavinsky Decl. ¶ 16.  Yavinsky and Senior Director of Human Resources Anthony Vazquez approved a "Job Elimination Business Case" for Plaintiff's position on July 31, 2014.  *Id.* ¶ 18; Ex. T to Pl.'s CSF, ECF No. 70-22.  On August 28, 2014, Yavinsky informed Plaintiff that his position was being eliminated, effective September 12, 2014.  Yavinsky Decl. ¶ 20.  Yavinsky offered Plaintiff the new (lesser-paying) Marketing Manager position that was replacing Plaintiff's position, but Plaintiff was not interested.  *Id.*

Plaintiff contacted Soldwisch on September 2 and 3, 2014, alleging that his position was eliminated as retaliation for Plaintiff's involvement in the firing of Hunandi, Yavinsky's friend.  Soldwisch Decl. ¶ 10.  On September 11, 2014, Senior Director of Human Resources S. Lani Aranio ("Aranio") began an investigation into Plaintiff's allegations.  Aranio Decl. ¶ 2, ECF No. 56-9.  On September 26, 2014, Aranio told Plaintiff that the investigation was complete, his allegations could not be substantiated, and he had a new position elimination date of October 10, 2014.  *Id.* ¶ 3.  Plaintiff then gave Aranio new documents, which Aranio investigated further.  *Id.* ¶ 4.  On October 17, 2014, Plaintiff called Aranio and she told him that, even with the additional documents, his allegations could not be substantiated.  *Id.* ¶ 8.

## B.   Procedural Background

Plaintiff filed a First Amended Complaint ("FAC") on September 29, 2015, asserting the following claims against Defendant: 1) retaliation in violation of Title VII of the Civil Rights Act of 1964; 2) retaliation in violation of Hawaii Revised Statutes ("HRS") § 378-2(2); and 3) intentional infliction of emotional distress ("IIED").  FAC ¶¶ 271-83, ECF No. 13.

On July 20, 2016, Defendant filed a Motion for Summary Judgment on all claims.  Def.'s Mot., ECF No. 55.  On September 12, 2016, Plaintiff filed his

8

Opposition brief, and on September 19, 2016, Defendant filed its Reply brief.  Pl.'s

Opp'n, ECF No. 69; Def.'s Reply, ECF No. 71.  A hearing was held on November

21, 2016.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party

who fails to make a showing sufficient to establish the existence of an element

essential to the party's case, and on which that party will bear the burden of proof

at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v.*

*Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

carried its burden under Rule 56[(a)] its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts [and] come forward

9

with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. <u>DISCUSSION</u>

### A. Plaintiff's Retaliation Claims

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a useful and accepted framework to address Title VII claims. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citing *Costa v. Desert Palace*, 299 F.3d 838, 855 (9th Cir. 2002) (en banc)). It is "a tool to assist plaintiffs at the summary judgment stage" in cases where there may be "difficulties [in] proving

10

intent to discriminate in a disparate treatment context." *Costa*, 299 F.3d at 854-55.

When responding to a summary judgment motion, the plaintiff "may proceed by

using the *McDonnell Douglas* framework, or alternatively, may simply produce

direct or circumstantial evidence demonstrating" discriminatory or retaliatory

intent. *McGinest*, 360 F.3d at 1122.  That is, a plaintiff may respond by producing

evidence "demonstrating that a discriminatory [or retaliatory] reason more likely

than not motivated the employer." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097,

1105 (9th Cir. 2008) (quoting *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir.

2007)).  Here, the parties present their respective arguments under the traditional

*McDonnell Douglas* framework.[3]

Under Title VII, an employer may not discriminate against an

employee because the employee has opposed an employment practice made

unlawful by Title VII.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful

employment practice for an employer to discriminate against any of his employees

. . . because he has opposed any practice [prohibited by Title VII] . . . or because he

has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa*

---

[3] Because Plaintiff's federal and state claims are analyzed under the same *McDonnell Douglas* framework, the court does not distinguish between the claims in its analysis.  *See Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 425-26, 32 P.3d 52, 69-70 (2001).

*Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's antiretaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation marks omitted)).

Within the traditional *McDonnell Douglas* framework for Title VII claims, a plaintiff first has the burden to establish a *prima facie* case for retaliation. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).  If a plaintiff establishes a *prima facie* case, "the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory [or retaliatory] reasons." *Id.*  Once the defendant fulfills this burden, "the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory [or retaliatory]." *Id.* (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985) (internal quotation marks omitted)).

To show pretext, a plaintiff must do more than merely deny the credibility of the defendant's proffered reason.  *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir.1986).  "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or

indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641; *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094–95 (9th Cir.2005). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer." *Coghlan*, 349 F.3d at 1095. Circumstantial evidence requires an additional inferential step to demonstrate retaliation. *Id.*

When the evidence of pretext is direct, "very little evidence [is required] to survive summary judgment[.]" *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. Aug.18, 2009) (citation and quotation signals omitted). "'But when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment.'" *Id.* (quoting *Coghlan*, 413 F.3d at 1095); *see also Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir.2005); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir.2004).

The court addresses each step of the burden-shifting analysis in turn.

### 1.   *Plaintiff's* **Prima Facie** *Case for Retaliation*

To establish a *prima facie* case for retaliation, Plaintiff must show: 1) he engaged in a protected activity; 2) he suffered an adverse employment action; and 3) a causal link existed between the protected activity and the adverse

13

employment action.  *McGinest*, 360 F.3d at 1124.  Here, Defendant concedes that Plaintiff both engaged in a protected activity and suffered an adverse employment action.[4]  ECF No. 55-1, at 15 n.3; ECF No. 71, at 7 n.3.  Thus, the court only examines whether Plaintiff adequately proved a causal link between the protected activity and the adverse employment action.

"Title VII retaliation claims be must be proved according to traditional principles of but-for causation."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  The "but-for" standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.*  This inquiry "is a question of fact that must be decided in the light of the timing and the surrounding circumstances."  *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).

"[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).  However, the Ninth Circuit has also cautioned that "a specified time period cannot be a mechanically applied criterion."  *Coszalter*, 320 F.3d at 977-78 ("A rule that any period over a certain

---

[4] Defendant concedes that the elimination of Plaintiff's position is a materially adverse action, but contests Plaintiff's allegations that other actions were materially adverse.  Def.'s Reply at 7 n.3; ECF No. 71.  For the purposes of this Order, the court does not rely on Plaintiff's other allegations, and thus does not address them.

time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic.").  Because of this, courts must consider the "totality of the facts" given that some retaliators may scheme beyond an immediate adverse action.  *Id.* at 978 ("For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible.").

Viewed in the light most favorable to Plaintiff, the surrounding circumstances support an inference of a retaliatory motive.  First, Yavinsky admits that Hunandi was a "good friend" of his.  Yavinsky Dep. at 53.  Hunandi was one of only ten total people at Yavinsky's wedding -- no other coworker attended, aside from Yavinsky's wife.  *Id.* at 56.  Yavinsky's family and Hunandi's family vacationed together twice, first to Napa Valley and then to San Francisco.  *Id.* at 53-56.

Second, (and, again, construed in the light most favorable to Plaintiff) Yavinsky may have set Plaintiff up to fail shortly after Plaintiff engaged in protected activity.  Broderick informed Yavinsky in October 2013 that he was considering restructuring Plaintiff's marketing team or eliminating Plaintiff's position.  Ex. B to Def.'s CSF, ECF No. 56-4.  Broderick said these considerations were in response to "the challenges to getting tour flow."  *Id.*  In a November 26,

15

2013 email to Yavinsky, Broderick elaborated further that he was anticipating that Plaintiff's location would have "another rough period both in cost and lack of revenues."  Ex. C to Def's CSF, ECF No. 56-5.  On December 4, 2013, Yavinsky sent Broderick a proposal that included the elimination of Plaintiff's position.  Ex. D to Def.'s CSF, ECF No. 56-6.  Broderick and Yavinsky implemented several of the structural changes in Yavinsky's December 4 memo, but did not immediately eliminate Plaintiff's position.  Yavinsky Decl. ¶ 16.

In January 2014, shortly after Hunandi was fired, Yavinsky imposed a nine-month tour restriction -- no one who had toured a Marriott property within the previous nine months was eligible for an incentivized tour -- on Kauai.  2d Yavinsky Decl. ¶ 2.  Although this restriction was lifted in favor of a three-month/six-month tour restriction after a "five- to six-week period" *id.*, Broderick stated that his decision would be based "improve[ments] on productivity . . . by end of Period 1 2014," Ex. C to Pl.'s CSF.  The parties agreed at the November 21, 2016 hearing that a "period" is four weeks, and "Period 1" would be the first four weeks of 2014.  As a result, this possibly stifling restriction was in place for all of Broderick's relevant time period -- Period 1 2014.  And Yavinsky could not identify another tour location with a similar nine-month restriction.  Yavinsky Dep. at 222:24-225:12.

16

Yavinsky moved to a three-month/six-month restriction in February 2014.  2d Yavinsky Decl. ¶ 3.  Plaintiff continued to complain to Yavinsky about the negative impact of the new three-month/six-month tour restrictions, but other than making some minor adjustments, Yavinsky refused to lift them.  Yavinsky Decl. ¶¶ 14-15.  The tour restrictions remained in place through the elimination of Plaintiff's position.  *Id.* ¶ 15.  On May 6, 2014, four months after Yavinsky initiated the tour restrictions, Broderick approved Yavinsky's proposal to eliminate Plaintiff's position because it was "apparent that [Plaintiff's] marketing team as structured [would] not produce the necessary tour flow to achieve budgeted revenues at the budgeted expense level for the project."  Ex. R to Pl.'s CSF.

Next, the timing between the protected activity and adverse action also supports an inference of retaliatory motive.  Yavinsky implemented new tour restrictions a mere few weeks after Hunandi's firing (and approximately one month after Plaintiff's report of the sexual harassment), which, again viewed in the light most favorable to Plaintiff, could be viewed as part of Yavinsky's scheme to set Plaintiff up to fail.  The timing of the new tour restrictions surely came "on the heels of" Hunandi's firing, and further supports an inference of retaliatory motive.[5]

---

[5] Even if the timing is viewed as six months -- the time between Plaintiff's protected activity and Broderick's decision to eliminate Plaintiff's position -- this is still sufficient to support an inference of a retaliatory motive.  *Compare Coszalter*, 320 F.3d at 977 ("Depending

Considering everything above -- the timing of Plaintiff's position elimination, the close relationship between Yavinsky and Hunandi, and Yavinsky's unique restrictions on Plaintiff's tour production -- a reasonable jury could conclude that Plaintiff's protected activity was the "but for" cause for the elimination of Plaintiff's position.

Defendant argues that Plaintiff's protected activity could not be the "but for" cause because the decision to eliminate Plaintiff's position happened before Plaintiff's protected activity.  Def.'s Mot. at 16.  Other than Yavinsky's self-serving declaration, there is no evidence that Broderick communicated such a decision before Plaintiff's protected activity.  Yavinsky Decl. ¶ 7.  In fact, elsewhere in his declaration, Yavinsky states otherwise: "In May 2014, Mr. Broderick expressed that it was clear that the restructuring of the marketing team needed to proceed as soon as possible and he specifically asked for the business plan to eliminate the Director of Marketing position, to be replaced with a second Marketing Manager position." *Id.* ¶ 16.  This timeline is consistent with the email from Broderick to Yavinsky expressing that will.  Ex. R to Pl.'s CSF.  Although Yavinsky proposed eliminating Plaintiff's position before Plaintiff's protected

on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation."), *with Villiarimo*, 281 F.3d at 1065 ("A nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation.").

activity occurred, the final decision to eliminate Plaintiff's position did not occur until six months after Plaintiff's protected activity.

Defendant next argues that Plaintiff's protected activity could not be the "but for" cause because there is no evidence that Broderick, the person who made the decision to eliminate Plaintiff's position, knew about Plaintiff's protected activity.  Def.'s Mot. at 18.  But, under the "cat's paw" or "rubber stamp" theory of liability, the Ninth Circuit recognizes that a subordinate's bias can be imputed to the decisionmaker:

> We hold that if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

*Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).  Here, Yavinsky clearly influenced Broderick's decisionmaking process, as Broderick's ultimate decision was based upon his belief that "the Kauai marketing team as structured will not produce the necessary tour flow to achieve budgeted revenues at the budgeted expense level for the project."  Ex. R to Pl.'s CSF.  Yavinsky's new tour restrictions invariably affected tour flow, swaying Broderick's decision.  Viewing

19

the facts in the light most favorable to Plaintiff, Yavinsky's bias can be imputed to Broderick as the decisionmaker.

### 2.    *Defendant's Legitimate, Nondiscriminatory Reason*

Defendant identifies that it eliminated Plaintiff's position for "financial reasons." Def.'s Mot. at 19. Plaintiff, in his deposition, admits that this was the reason given to him by Yavinsky when Yavinsky informed Plaintiff of the position elimination. Pl. Dep. 175:15-176:13. Plaintiff does not appear to contest that this is a legitimate, nondiscriminatory reason. Pl.'s Opp'n at 28 (moving from arguing his *prima facie* case to arguing pretext). As such, for the purpose of this step in the *McDonnell Douglas* framework, the court assumes that Defendant's interest in "financial reasons" is a legitimate, nondiscriminatory reason.

### 3.    *Plaintiff's Proof that Defendant's Reason is Pretextual*

Finally, Plaintiff must demonstrate that Defendant's legitimate, nondiscriminatory reason was merely pretextual. To do so, Plaintiff "may rely on circumstantial evidence to show pretext," but "such evidence must be both specific and substantial." *Villiarimo*, 281 F.3d at 1062.

Plaintiff has offered specific and substantial evidence that, viewed in the light most favorable to Plaintiff, Defendant set him up to fail. As discussed at length earlier, there is evidence of the following: 1) Yavinsky and Hunandi were

very close friends; 2) Plaintiff's protected activity led to the firing of Hunandi;

3) Yavinsky knew Broderick was considering eliminating Plaintiff's position,

based upon tour flow; 4) within a few weeks of Hunandi's firing, Yavinsky

instituted new tour restrictions at Plaintiff's location; 5) Hunandi refused to lift the

tour restrictions, despite Plaintiff's complaints concerning their impact on tour

numbers; and 6) Broderick ultimately eliminated Plaintiff's position as a result of

inadequate tour revenue.

This evidence, although circumstantial, is sufficiently specific and

substantial to show pretext.

## B.  Plaintiff's Intentional Infliction of Emotional Distress Claim

The court agrees with Senior Judge Alan C. Kay's following

conclusion: "At the end of the day, Hawaii courts and federal courts applying

Hawaii law have held time and again that the exclusivity provision of Hawaii's

workers' compensation law bars IIED claims, unless those claims relate to sexual

harassment or sexual assault." *Kuehu v. United Airlines, Inc.*, 2016 WL 4445743,

at *8 (D. Haw. Aug. 23, 2016); *see, e.g.*, *Yang v. Abercrombie & Fitch Stores*, 128

Haw. 173, 183, 284 P.3d 946, 956 (Haw. Ct. App. 2012) ("Specific exceptions

were later carved out [of the workers' compensation statute] by the Legislature [in

HRS § 386-5]: . . . infliction of emotional distress related to sexual assault or sexual harassment -- *not* just any infliction of emotional distress[.]");.

Insofar as Plaintiff relies on *Bolla v. University of Hawaii*, 131 Haw. 252, 317 P.3d 696, at \*2 (Haw. Ct. App. 2014) (finding that HRS § 386-5 bars IIED claims "unless they arise out of sexual harassment, assault, or discrimination"), to argue that HRS § 386-5 excludes IIED claims based upon discrimination generally, this court agrees with Senior Judge Susan Oki Mollway who reconciled the unpublished *Bolla* disposition with *Yang*: "The *Bolla* decision may have used 'sexual' as an adjective modifying not only 'harassment,' but also 'assault' and 'discrimination.' Such a reading would be consistent with *Yang*[.]" *Chan v. Wells Fargo Advisors, LLC*, 124 F. Supp. 3d 1045, 1059 (D. Haw. 2015).

Accordingly, the court finds Plaintiff's IIED claim barred by HRS § 386-5, as it is not related sexual assault, sexual harassment, or sexual discrimination.

## V.  **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF No. 55, is GRANTED as to Plaintiff's IIED claim, and DENIED as to Plaintiff's retaliation claims under federal and state law.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 28, 2016.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Machorek v. Marriott Ownership Resorts, Inc.*, Civ. No. 15-00230 JMS-KSC, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, ECF No. 55

23